**PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation, Plaintiff,**

v.

**GATES RUBBER COMPANY, a Colorado corporation, Gates Energy Products, Inc., a Colorado corporation, The Gates Corporation, a Delaware corporation, Denver and Rio Grande Western Railroad, a Delaware corporation, Defendants.**

**No. CIV. A. 96 N 1922.**

United States District Court,
D. Colorado.

Dec. 16, 1997.

Garry R. Appel, Howard Kenison, Doherty, Rumble & Butler, P.C., Denver, CO, for Plaintiff.

Thomas C. Reeve, Linda J. Swanson, Bennington Johnson Ruttum & Reeve, Denver, CO, for Gates Defendants.

Kathleen M. Snead, Union Pacific Railroad Company, Denver, CO, for Defendant D & RGW.

Roger L. Freeman, Dean C. Miller, Davis, Graham & Stubbs, Washington, DC, for Defendant D & RGW.

## ORDER AND MEMORANDUM
## OF DECISION

NOTTINGHAM, District Judge.

This is an action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9601 to 9675 (West 1995 & Supp.1997). Plaintiff Public Service Company of Colorado ("PSCO") alleges that Defendants Gates Rubber Company, Gates Energy Products, Inc., and The Gates Corporation (collectively, "the Gates defendants"), as well as Defendant Denver and Rio Grande Western Railroad ("D & RG"), are liable for the costs associated with the cleanup of five parcels of land formerly used as the site of a metal salvaging business, and currently owned by PSCO. The matter is before the court on: (1) "The Gates Defendants' Motion for Summary Judgment" filed May 29, 1997; (2) "[D & RG's] Motion for Summary Judgment" filed June 27, 1997; (3) "[D & RG's] Motion for Summary Judgment" filed August 4, 1997; (4) "The Gates Defendants' Second Motion for Summary Judgment" filed August 4, 1997; and (5) "The Gates Defendants' Third Motion for Summary Judgment" filed August 4, 1997. Jurisdiction is based on 28 U.S.C.A. §§ 1331, 1346, and 1367 and 42 U.S.C.A. § 9613(b) (West 1993).

## FACTS

From the 1940's until the mid–1980's, Barter Machinery and Metals Company ("Barter") operated a metal salvaging business in Denver, Colorado, generally located north and east of the intersection of South Santa Fe Drive and West Bayaud Avenue. (Final Pretrial Order, Stipulations ¶ 1 [tendered Oct. 1, 1997] [hereinafter "Stipulations"].) The site is comprised of five separate parcels of land located at 100 South Santa Fe Drive ("Lot A"); 101 South Santa Fe Drive ("Lot B"); 701 West Bayaud ("Lot C"); 60 Inca Street ("Lot D"); and 45 and 60–68 Inca Street ("Lot E"). *Id.* For more than twenty-five years, PSCO sold scrap metal to Barter, including scrap iron, copper, and electrical equipment. (The Gates Defs.' Br. in Supp. of their Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 2 [filed May 29, 1997] [hereinafter "Gates' First Br."]; *admitted at*

Pl.'s Br. in Opp. to Gates' Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 2 [filed June 23, 1997] [hereinafter "Pl.'s Resp. to Gates' First Br."].) PSCO also sold Barter oil-filled electrical transformers containing the hazardous substance polychlorinated biphenyls ("PCBs") during the period from 1963–75. (Gates' First Br., Statement of Undisputed Material Facts ¶ 2; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 2.)

In 1989, Barter retained ATEC Environmental Consultants ("ATEC") to do some environmental testing on the Barter site. (Pl.'s Br. in Opp. to D & RG's Mot. for Summ. J., Statement of Additional Disputed Material Facts ¶ 1 [filed Aug. 27, 1997] [hereinafter "Pl.'s Resp. to D & RG's Second Br."], *admitted at* [D & RG's] Reply Br. in Supp. of its Mot. for Summ. J., Resp. Concerning Disputed Facts ¶ 1 [filed Sept. 10, 1997] [hereinafter "D & RG's Second Reply"].) On November 16, 1989, ATEC issued a preliminary assessment entitled "Phase I Environmental Report" which included "limited soil sampling" and analyzed "several oil stained areas" for PCBs. (*Id.,* Statement of Additional Disputed Facts ¶ 1; *admitted at* D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 1.) In addition, ATEC sampled "iron stained soil" and "sludge in the drain pit" and then analyzed the "heavy metals" content of those samples. (*Id.,* Statement of Additional Disputed Facts ¶ 1; *admitted at* D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 1.) ATEC found PCBs in the oil-stained areas of the soil and detected lead contamination in the areas tested. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Facts ¶ 1; *admitted at* D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 1.)

As of March 28, 1990, PSCO knew that the Barter site was contaminated with PCBs and recognized itself to be a potentially responsible party ("PRP") under CERCLA with respect to that cleanup. (Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 3; *admitted at* The Gates Defs.' Reply Br. in Supp. of their Mot. for Summ. J., Reply Concerning Undisputed

Facts ¶ 3 [filed July 7, 1997] [hereinafter "Gates' First Reply"].) On April 25, 1991, Barter and PSCO reached an agreement to fund the cost of an in-depth investigation to ascertain the location and extent of the environmental contamination at the Barter site. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Material Facts ¶ 3; *admitted at* D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 3.) Defendants allege that the agreement was also negotiated because other contamination, including lead, was found at the site. (D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 3.) In 1992, PSCO proposed that title to the Barter properties be transferred to it in exchange for PSCO paying off tax and creditor's liens on the properties and cleaning up the parcels. (Gates' First Br., Statement of Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 5.) PSCO intended to sell the site once it was cleaned up. (*Id.,* Statement of Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 5.) Barter and PSCO entered formal title agreements with respect to the Barter site on January 29, 1993; August 1993; and December 1993. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 1; *admitted at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 1.)

PSCO commissioned an environmental assessment ("Environmental Assessment") of the site from ERM–Rocky Mountain, Inc. ("ERM"). (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 2; *admitted at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 2.) On or about September 25, 1992, PSCO received the Environmental Assessment of Lots A, C, and D. (*Id.,* Statement of Additional Disputed Facts ¶ 2; *admitted at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 2.) On October 30, 1992, PSCO received a supplementary assessment of Lots A and E. (*Id.,* Statement

of Additional Disputed Facts ¶ 2; *admitted at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 2.)

The Environmental Assessment recommended cleanup levels and a preferred remedial approach. (Gates' First Br., Statement of Undisputed Facts ¶ 4; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 4.) No other document was created to evidence alternative remedial methods for the Barter site beyond that provided in the ERM Environmental Assessment. ( [D & RG's] Br. in Supp. of its Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 6 [filed Aug. 4, 1997] [hereinafter "D & RG's Second Br."]; *admitted at* Pl.'s Resp. to D & RG's Second Br., Resp. to Statement of Undisputed Material Facts ¶ 6.) PSCO contends that, upon receiving the Environmental Assessment, it determined that the Barter site presented an "imminent threat" to the public health, safety, and welfare, particularly given the site's accessibility to children in the surrounding residential community. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 3; *disputed at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 3 *and* D & RG's Second Br., Statement of Undisputed Material Facts ¶ 1.) PSCO's planned environmental cleanup or "response action" [1] at the Barter site was intended to effect a long-term, permanent remedy to the contamination at the site. (D & RG's Second Br., Statement of Undisputed Material Facts ¶ 7; *admitted at* Pl.'s Resp. to D & RG's Second Br., Resp. to Statement of Undisputed Material Facts ¶ 7.) The parties dispute whether PSCO ever gave the public an opportunity to comment on the process of hiring ERM to do an Environmental Assessment. (Gates' First Br., Statement of Undisputed Facts ¶ 4; Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 4.) The parties agree, however, that PSCO never solicited comments from any businesses or other PRPs prior to choosing its site action levels. [2]

1. A response action refers to any action taken pursuant to a release or threatened release of hazardous substances into the environment, "including [government] enforcement actions related thereto." *See* 42 U.S.C.A. § 9601(24)-(26).

2. "Action levels" refer to guidelines based on the hazard which the chemical poses to humans in residential and nonresidential areas. Often they refer to regulatory or statutory standards used to determine which areas of a given site will require

(Gates' First Br., Statement of Undisputed Facts ¶ 19; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 19.)

PSCO selected United States Pollution Control, Inc. ("USPCI") to perform the cleanup, and USPCI's cleanup work at the Barter site began on November 30, 1992. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 5; *admitted at* Gates' First Reply, Resp. Concerning Disputed Facts ¶ 5.) Construction of a security fence also began on this date. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Material Facts ¶ 14; *admitted at* D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 14.) On the day the cleanup began, PSCO posted a few English-only signs around the Barter site. (Gates' First Br., Statement of Undisputed Facts ¶ 13; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 13.) The signs were identical to each other and simply read, "Any Questions About Site Activities, please call 294–8488." (*Id.,* Statement of Undisputed Facts ¶ 13; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 13.) Nothing on the signs revealed that the site was contaminated with hazardous waste, nor did the signs refer to CERCLA. (Gates' First Br., Statement of Undisputed Facts ¶ 14; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 14.)

PSCO was trying to "take a low profile" concerning the cleanup. (Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 8; *admitted at* Gates' First Reply, Reply to Statement of Undisputed Facts.) On April 20, 1993, a local newspaper published an article about the cleanup. (Gates' First Br., Ex. J [Bill Scanlon, *Public Service Aims to Clean Up Toxic Scrap Heap by June,* Rocky Mtn. News, Apr. 20, 1993, at 16A].) Because of the article, PSCO was concerned about being portrayed as an environmental "bad guy" in the press. (Gates' First Br., Statement of Undisputed Facts ¶ 9; *admitted at* Pl.'s

Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 9.)

PSCO formulated no community relations plan ("CRP") as a part of the Barter cleanup. (Gates' First Br., Statement of Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 10.) PSCO did not conduct interviews with any persons in the neighborhood or the surrounding community about the Barter cleanup. (Gates' First Br., Statement of Undisputed Facts ¶ 12; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 12.) After the cleanup had begun, PSCO representatives spoke with the eight to ten people in the neighborhood who approached PSCO themselves, but PSCO did not volunteer any information or ask for input about the on-going remediation process. (Gates' First Br., Statement of Undisputed Facts ¶ 15; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 15.) PSCO failed to publish, on its own initiative, an article or notice in any local newspaper concerning the remediation plans for the site or any alternatives. (Gates' First Br., Statement of Undisputed Facts ¶ 16; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 16.) PSCO did not create a repository in any public library to allow the public to review information about the cleanup. (Gates' First Br., Statement of Undisputed Facts ¶ 17; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 17.) PSCO did not provide an opportunity for a public meeting that would have allowed members of the public to express their views about site activities. (Gates' First Br., Statement of Undisputed Facts ¶ 18; *admitted at* Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 18.)

The parties dispute when PSCO first became aware that contaminants other than PCBs were in the soil at the Barter site. Plaintiff asserts that the initial cleanup was designed to address only the PCB-contaminated soil over an eleven-week period because, at the time the original work

remediation. *See Hatco Corp. v. W.R. Grace &* Co., 836 F.Supp. 1049, 1093 (D.N.J.1993).

commenced, PSCO believed that the only hazardous wastes on the site were the result of PCB contamination. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 7.) On the other hand, defendants allege that, at least by 1990, PSCO was aware that contaminants other than PCBs were present in the soil. (Gates' First Reply, Resp. Concerning Disputed Facts ¶ 7 [citing Gates' First Reply, Ex. B (fax from PSCO counsel to PSCO's Environmental Section of 3/13/90) ].) The parties do not dispute, however, that once the excavation process began, soil testing of the excavated material revealed lead contamination sufficient to constitute hazardous waste. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 8; admitted at Gates' First Reply, Resp. Concerning Disputed Facts ¶ 8.) Although PSCO initially proposed to stabilize the lead-contaminated soils on-site when it believed that they did not constitute a hazardous waste, the Colorado Department of Health ("CDH") ultimately precluded that remedy, mandating that the lead-contaminated soils (as well as the PCB-contaminated soils) be removed from the site and disposed of in an appropriately licensed facility. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Material Facts ¶ 24; admitted at. D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 24.) On September 20, 1993, PSCO and CDH entered into a "Compliance Order on Consent" [hereinafter "Consent Order"] regarding continued cleanup activities at the Barter site. (Pl.'s Resp. to Gates' First Br., Statement of Additional Disputed Facts ¶ 10; admitted at Gates' First Br., Ex. I [Consent Order].) Following the Consent Order, with the approval of the CDH, PSCO continued its response action by excavating and removing the contaminants and disposing of them off-site. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Material Facts ¶ 29; admitted at D & RG's Second Reply, Resp. Concerning Disputed Facts ¶ 29.)

On June 18, 1993, PSCO formally notified the Gates defendants that they were potentially liable for a portion of the Barter cleanup costs. (Gates' First Br., Statement of Undisputed Facts ¶ 6; admitted at Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 6.) PSCO claims to have spent approximately nine million dollars on the Barter cleanup. (Gates' First Br., Statement of Undisputed Facts ¶ 20; admitted at Pl.'s Resp. to Gates' First Br., Resp. to Statement of Undisputed Material Facts ¶ 20.). On August 14, 1996, PSCO filed a complaint in this court in which it asserted claims against defendants for: (1) cost-recovery under CERCLA (first claim); (2) contribution under CERCLA (second claim); (3) declaratory judgment regarding future response costs associated with the cleanup of the Barter site (third claim); (4) nuisance (fourth claim); (5) joint and several liability under the Uniform Contribution Among Tortfeasors Act ["UCATA"], Colo. Rev.Stat. §§ 13–50.5–101 to 13–50.5–106 (1987 & Supp.1996), (fifth claim); and (6) strict liability (sixth claim). (Compl. [filed Aug. 14, 1996].)

On October 21, 1996, the Gates defendants moved to dismiss PSCO's first, third, fourth, fifth, and sixth claims. ( [The Gates Defs.'] Mot. to Dismiss Pl.'s Compl. [filed Oct. 21, 1996].) On November 1, 1996, D & RG also moved to dismiss those claims. (Def. [D & RG's] Mot. to Dismiss [filed Nov. 1, 1996].) I granted these motions with respect to the first, third, fourth, and sixth claims; I denied them with respect to the fifth claim. (Ord. and Mem. of Decision [filed Apr. 10, 1997].)

Defendants now move for summary judgment on PSCO's second claim, arguing that PSCO is not entitled to any CERCLA relief because it failed to substantially comply with the public comment requirement of the National Contingency Plan ("NCP").[3] ( [The Gates Defs.'] Mot. for Summ. J. [filed May 29, 1997] [hereinafter, "Gates' First Mot. for Summ. J."]; [D & RG's] Mot. for Summ. J. [filed Jun 27, 1997] [hereinafter "D & RG's First Mot. for Summ. J."].) In another motion, defendants argue that PSCO failed to

---

3. The NCP is a set of EPA regulations which "establish procedures and standards for respond- ing to the release of hazardous substances, pollutants and contaminants." 42 U.S.C.A. § 9605.

sufficiently comply with several mandatory provisions of the NCP in addition to the public comment provision. ( [D & RG's] Mot. for Summ. J. [filed Aug. 4, 1997] [hereinafter "D & RG's Second Mot. for Summ. J."]; The Gates Defs.' Third Mot. for Summ. J. [filed Aug. 4, 1997] [hereinafter Gates' Third Mot. for Summ. J.].) PSCO contends that it sufficiently complied with all of the relevant NCP standards. (Pl.'s Resp. to Gates' First Br.; Pl.'s Br. in Opp. to [D & RG's] Mot. for Summ. J. [filed July 17, 1997] [hereinafter "Pl.'s Resp. to D & RG's First Br."]; Pl.'s Resp. to D & RG's Second Br.)

Defendants also move for summary judgment on PSCO's fifth claim for contribution pursuant to state tort law. (The Gates Defs.' Second Mot. for Summ. J. [filed Aug. 4, 1997] [hereinafter "Gates' Second Mot. for Summ. J."]; D & RG's Second Mot. for Summ. J.) They argue that (1) there is no underlying tort on which to base this claim, (2) PSCO's agreement with Barter precludes PSCO from seeking contribution from defendants for the cleanup, and (3) if they are ultimately to be found liable for any contribution, their damages should be limited to those which PSCO incurred for cleanup in Lot A only. (Gates' Second Mot. for Summ. J.; D & RG's Second Mot. for Summ. J.)

## ANALYSIS

### 1. Legal Standard

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed. R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 [10th Cir.1990] ).

### 2. Compliance with the NCP

#### a. NCP Requirements for a Contribution Claim

Contrary to PSCO's arguments, courts have found meaning in 42 U.S.C.A. § 9613(f)—which enables one PRP who performs a cleanup to seek an "equitable" contribution share from other PRPs—only by reading that section in conjunction with 42 U.S.C.A. § 9607—which establishes the basis for CERCLA liability for all contributing parties. *See, e.g., Pinal Creek v. Newmont Mining Corp.*, 118 F.3d 1298, 1305 (9th Cir. 1997). Under section 9607 only "necessary costs of response" which have been incurred "consistent with the [NCP]" are recoverable. 42 U.S.C.A. § 9607. Consistent with these holdings, the Tenth Circuit has determined that "absent a showing that [a party's] response costs were incurred consistent with the NCP, no right to contribution for these costs exists under CERCLA." *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1516 (10th Cir.1991); *see also Bancamerica Commercial Corp. v. Mosher Steel*, 100 F.3d 792, 796 (10th Cir.1996) ("In order for [the PRPs who financed the cleanup] to obtain contribution from [a third PRP], their response actions must have been 'consistent with the

[NCP].'") (quoting 42 U.S.C. § 9607[a][4][B] [1994]) (footnote omitted); *see also Sun Co., Inc. v. Browning–Ferris, Inc.*, 124 F.3d 1187, 1193 (10th Cir.1997) ("Together, [sections] [9607] and [9613] allow 'any person' who has incurred cleanup costs consistent with the [NCP] to recover some or all of those costs from PRPs who were responsible for the waste.") PSCO's argument that no case law supports NCP compliance as a prerequisite to a contribution claim disregards the clear line of precedent linking contribution actions to the recovery provisions of CERCLA.

■ Where the party seeking recovery or contribution for response costs is the United States, a state, or an Indian tribe, there is a presumption that its cleanup actions were taken consistent with the NCP. *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir.1992). In contrast, any "other party" seeking costs from a PRP bears the burden of proving that its actions were consistent with the NCP. *Id.; accord Washington State Dep't of Transp. v. Washington Natural Gas Co., Pacificorp*, 59 F.3d 793, 799 (9th Cir. 1995). Here, PSCO bears the burden of proving its consistency with the NCP before it may obtain contribution from the defendants. *See County Line Inv. Co.*, 933 F.2d at 1516 (holding that the burden of proof is on the party seeking contribution to show that its costs were incurred consistent with the NCP).

Defendants allege that, as a matter of law, PSCO is not entitled to contribution because it failed to comply with the procedural prerequisites of the NCP. Since 1990, the EPA has required only "substantial compliance" with the applicable NCP provisions for private party response actions, provided that the response action "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i) (1990); *but see* 40 C.F.R. § 300.71 (1988) (requiring "strict compliance" with NCP provisions); *see also County Line Inv. Co.*, 933 F.2d at 1514 (explaining the regulatory de-

velopment from "strict" to "substantial" compliance). The first issue for this court, then, is whether plaintiff has proffered sufficient evidence to demonstrate its substantial compliance with the NCP.[4] In pertinent part, the regulations outline requirements for (1) applicable response action procedures and (2) "public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(5), (6).

**b. Scope of Response Action: Remedial or Removal**

■ The NCP standard varies, depending upon whether the private party's response action is construed as "removal" or "remedial." "The division of responses into the two categories of removal and remedial actions is designed to provide an opportunity for immediate action—a removal—without detailed review, where there is no time to safely conduct such review due to the exigencies of the situation." *Channel Master Satellite, Systems, Inc. v. JFD Electronics Corp.*, 748 F.Supp. 373, 385 (E.D.N.C.1990). Accordingly, the community relations and other procedural requirements for removal actions are less stringent than for remedial actions. *Bancamerica*, 100 F.3d at 797; *accord Greene v. Product Mfg. Corp.*, 842 F.Supp. 1321, 1326 (D.Kan.1993). As PSCO aptly points out, "it is certainly conceivable that the fact finder could determine that there was compliance with the applicable requirements for removal actions, but not for remedial actions. Therefore, the determination of whether the action was removal or remedial is material to the resolution of this case." (Pl.'s Resp. to D & RG's First Br. at 6.) PSCO's subsequent assertion—that this matter is not before the court at this time—is in error, for the removal versus remedial taxonomy is fundamental to the issue of whether PSCO's response action adequately complied with the appropriate NCP.

A removal action refers to the following:

---

4. "[T]he point at which a party must make the necessary showing of consistency with the NCP is dependent on the development of a satisfactory factual record, which is in turn dependent on when the contribution action is filed relative to completion of the response action." *Id.* at 1516 n. 12. To survive summary judgment, a plaintiff

must therefore make a *prima facie* showing of this element. *Id.* at 1518. Here, the factual record is sufficiently developed to make an NCP consistency determination. As such, "there is nothing to be gained by delaying this determination until trial." *Id.* at 1513.

The cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C.A. § 9601(23). The statute offers such examples as "security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals ... and any emergency assistance which may be provided [by statute]." *Id.* Courts have found that removal actions are generally "taken in response to an immediate threat," *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1577 (E.D.Pa.1988), and only applied " 'in that limited set of circumstances involving a need for rapid action, while non-urgent situations are to be addressed as remedial actions.' " *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. 683, 689 (E.D.Wis.1996) (quoting *Channel Master,* 748 F.Supp. at 385). According to one court which addressed the distinction at length, a removal action:

is a more limited, narrower response to a less drastic environmental problem [which does] not contemplate lengthy, extensive cures; rather, by definition, removal actions are prescriptive in what they encompass .... [R]emoval actions are taken in response to an immediate threat since they are more limited in scope; the purpose of a removal action is to address quickly a short-term problem.

*Rhodes v. County of Darlington, S.C.,* 833 F.Supp. 1163, 1182 (D.S.C.1992). In contrast, remedial actions effect more permanent, long-term solutions. *Exxon Corp. v. Hunt,* 475 U.S. 355, 359, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986); *Bancamerica,* 100 F.3d at 797; *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1534 (10th Cir.1992). The statute offers extensive examples of remedial actions such as:

actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances ..., recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration .... The term includes the costs of permanent relocation of residents .... [and] offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances.

42 U.S.C.A. § 9601(24). "Remedial actions anticipate permanent solutions to contaminated sites. Hence, remedial actions, going to the crux of contamination, provide for substantive, complex measures of abatement and cure .... Remedial actions are permanent in scope and therefore require more time to prepare and implement." *Rhodes,* 833 F.Supp. at 1182.

PSCO argues that, if it is required to comply with NCP standards at all, its cleanup efforts should be categorized as a removal action, and therefore subject to less stringent NCP guidelines. PSCO contends that even "an excavation that totally and permanently cleans up a hazardous waste site *can be* classified as a removal action." (Pl.'s Resp. to Gates' First Br. at 8 [emphasis supplied] [citing *General Elec. Co. v. Litton Indus. Automation Sys.,* 920 F.2d 1415 (8th Cir. 1990)].) *General Elec. Co.*'s lukewarm endorsement of this notion is unpersuasive. *See id.* at 1419 n. 4 ("We do not read [the case law] as establishing that an excavation that totally and permanently cleans up a hazardous waste site *never can be* classified as a removal action") (emphasis supplied). The *General Elec. Co.* court supported its holding by noting only that NCP regulations list "[r]emoval of contaminated soils" as one example of a removal action. Yet, as even *General Elec. Co.* acknowledged, the statutory definition of a remedial action also lists excavations as an example of a remedial action. *Id.* at 1419. The underlying policy

behind the removal/remedial distinction, as well as the language in the most cases and the statute cited above, make clear that permanent environmental cleanups are meant to be construed as remedial actions.

In this case, PSCO admits that it sought to remedy its environmental problems permanently. According to the remedial action proposal produced by PSCO's contracted environmental cleaner, USPCI, "[t]he objective of the project is to remediate the areas within the site known to contain [contamination]." (Pl.'s Resp. to Gates' First Br., Ex. 9 [PSCO/Barter Environmental Remediation Workplan at 1] [hereinafter "USPCI Workplan"].) Indeed, it is an undisputed fact that PSCO's response action at the Barter site was intended to effect a long-term, permanent remedy. The proposal reifies this assertion when it notes that previous EPA Records of Decision have set lead remediation action levels at 500 [parts per million] ("ppm") to 1000 ppm, and, at its own initiative, PSCO opted for a 500 ppm action level: "USPCI believes that this action level is very conservative and should alleviate PSCO's long-term liability concerns." (*Id.*, Ex. 9 [USPCI Workplan at 2].) Deposition testimony also reveals that PSCO chose the "conservative" cleanup thresholds of 500 ppm for lead and 3 ppm for PCBs to limit its future liability and enable PSCO to resell the site. According to USPCI employee Eric Silco, "at the time, we thought it was conservative, but ... [PSCO] said they wanted to sell their properties ... that was pretty much their insistence to get ... the levels pretty low, if they were going to resell the property. And there were other homes in the neighborhood, and it was close to the river." (D & RG's Second Br., Ex. L [Silco Dep. at 25].)

The evidence further shows that PSCO's planned cleanup actions were consistent with the statutory examples of remedial action activities. Such actions included (1) extensive soil excavation of PCB and lead-contaminated soil, (2) removal and cleaning of PCB-contaminated concrete, (3) on-site analysis, treatment, and stabilization of contaminated soil in preparation for shipment and disposal, (4) continued testing to monitor levels of PCB and lead in soil and water, (5) under- ground storage tank removal and off-site destruction, and (6) off-site transport and off-site storage, treatment, and disposition of hazardous substances. (Pl.'s Resp. to Gates' First Br., Ex. 9 [USPCI Workplan].) Notably, PSCO's environmental consultants did not seem to feel the sort of haste which would imply a removal action. In their reports, they suggest at least two additional studies might be necessary: (1) "a thorough cost evaluation and feasibility study of several options;" and (2) "[f]urther lead soil testing across the site and at different depths ... to develop a precise estimate of the impact." (Pl.'s Resp. to D & RG's Second Br., Ex. 3 [Environmental Assessment at 25, 27].) Although it did not commission such additional study, PSCO's actions belie its assertion that it was forced to respond quickly to an emergency situation. Initial tests revealing soil contamination were completed as of 1989, and by 1990, PSCO knew it was a PRP with regard to the Barter site. As the record shows, however, Barter's attorney had to write PSCO's counsel months after the agreement between the two had been drafted, urging it to stop "dragging its feet" and to formally follow through on its offer of assistance in the cleanup. (D & RG's Second Br., Ex. D [letter from Kurtz–Phelan to Flanagan of 3/19/91].) PSCO's further environmental research and decision-making extended into late 1992, when the initial cleanup finally commenced. Once the CDH became actively involved and the Consent Order governed the cleanup, the schedule extended even longer. ([D & RG's] Reply Br. in Supp. of Its Mot. for Summ. J., Ex. D [Barter Machinery Site Cleanup Memo of 11/19/93] [filed July 31, 1997] [hereinafter "D & RG's First Reply"]; *see also* Pl.'s Resp. to D & RG's Second Br., Ex. 24 [USPCI Amended Excavation Plan for Lot C of 7/25/94 at § 3.0] [proposing excavation schedule for Lot C from July–Aug. 1994].) The extent of PSCO's ability to plan its actions—both its initial PCB cleanup and the negotiated Consent Order—matches the policy behind the more complex, carefully planned remedial actions. In sum, I find that PSCO's response was, as a matter of law, a remedial action. As such, it will be subject to the NCP standards for remedial

actions referred to in 40 C.F.R. § 300.700(c)(5)-(6).

### c. Application of the Remedial NCP Standards

As noted above, private party response actions, especially remedial actions, are subject to a complex series of regulations under the NCP. The NCP for private remedial actions has four primary requirements, each of which is detailed through extensive regulation: (1) identification of applicable or relevant and appropriate requirements ("ARARs") as mandated by 40 C.F.R. § 300.400(g); (2) remedial site evaluation, which may consist of two steps, including a remedial preliminary assessment ("PA") and a remedial site inspection ("SI"), as required by 40 C.F.R. § 300.420; (3) remedial investigation/feasibility study and selection of remedy, as required by 40 C.F.R. § 300.430; and (4) remedial design ("RD")/remedial action ("RA"), operation, and maintenance of selected remedy, as required by 40 C.F.R. § 300.435. In addition, the statute provides a whole separate section of regulations under the "public comment" aegis. Section 300.700(c)(6) outlines a panoply of public comment requirements for each stage of the remedial process, according to 40 C.F.R. §§ 300.415, 300.430, and 300.435. Finally, as noted above, for a private party to obtain contribution for a response action, it must also demonstrate that the action resulted in a "CERCLA-quality cleanup." Several of the "CERCLA-quality" standards are similar to those already mandated by the NCP provisions, although they speak more to the end-product than the process used to arrive there. In its preamble to the 1990 revisions to the NCP, the EPA culled the revised CERCLA statute to define a "CERCLA-quality cleanup" by private actors. To reach such a standard, the remedial action must:

(1) be "protective of human health and the environment," utilize "permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable," and be "cost-effective"[;]

(2) attain applicable and relevant and appropriate requirements (ARARs)[; and]

(3) provide for meaningful public participation.

National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. 8666, 8793 (1990) (quoting 40 C.F.R. § 300.430[f][1][ii][A], [D], and [E] ) (citing also 40 C.F.R. § 300.430 *passim* ); *see also County Line Inv. Co.,* 933 F.2d at 1514 (citing same).

■ At the outset, I note the competing policies which complicate application of the NCP standards. CERCLA cost recovery actions (both full recovery and contribution) were designed to encourage private parties to " 'undertake hazardous waste cleanups with greater speed and at lower cost' " than a government-run cleanup, particularly given that " 'there are simply more private parties than there are government officials.' " *Channel Master,* 748 F.Supp. at 394 (quoting [Jeffrey M.] Gaba, *Recovering Hazardous Waste Cleanup Costs: The Private Cause of Action Under CERCLA,* 13 Ecology L.Q. 181, 231 [1986] ). This would imply a need for flexibility in allowing private parties to initiate their own cleanups. Indeed, the preamble cautions that "an omission based on lack of experience with the Superfund program should not be grounds for defeating an otherwise valid cost recovery action, assuming the omission does not affect the quality of the cleanup." National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. at 8793.

At the same time, the complex and detailed regulations reveal that the purpose of the mandatory NCP component " 'is to give some consistency and cohesiveness to response planning and actions,' " given the risks involved for the environment and the surrounding communities. *Channel Master,* 748 F.Supp. at 394 (quoting H.R.Rep. No. 96-1016, Part I at 30 [1980] *reprinted in* 1980 U.S.C.C.A.N. at 6133). The regulatory structure makes the significance of the meaningful public comment requirement especially clear. The preamble to the NCP says, "[t]he public—both PRPs and concerned citizens—have [sic] a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—which are performed without gov-

ernmental supervision—are carried out in an environmentally sound manner." National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. 8666, 8795 (1990) (to be codified at 40 C.F.R. pt. 300).

### i. Public Comment Requirement

■ Defendants first allege that PSCO has failed to substantially comply with the NCP based only on PSCO's failure to provide for sufficient public comment. PSCO asserts that it was not bound to the particular provisions set out in the NCP because its involvement with a state agency (CDH) in the cleanup project constituted substantial compliance with "substantially equivalent state and local requirements," for public comment, as the statute permits. (Pl.'s Resp. to Gates' First Br. at 14 [quoting 40 C.F.R. § 300.700(c)(6) ].) Indeed, some courts have held that an agency's active supervision over an otherwise private cleanup satisfied or substituted for the public comment requirement of the NCP because of the agency's obligation to serve the public interest. See General Elec. Co. v. Litton Bus. Systems, Inc., 715 F.Supp. 949, 961 (W.D.Mo.1989), aff'd sub nom. General Elec. Co., 920 F.2d 1415; see also American Color and Chem. Corp. v. Tenneco Polymers, Inc., 918 F.Supp. 945, 957 (D.S.C.1995) (finding that sufficient information regarding a remediation was disseminated to the public "either directly, or through state and federal agencies representing the public interest") (emphasis supplied).

By PSCO's own admission, however, CDH did not become actively involved in the Barter cleanup until September 21, 1993, when PSCO and CDH entered the Consent Order. (Pl.'s Resp. to Gates' First Br. at 15.) Regardless of the extent of the oversight from that point forward, this clearly does not satisfy the statutory interest in, and regulatory standards for, public comment. As one court noted, "Public comment means just that, public comment." Sherwin–Williams Co. v.

Hamtramck, 840 F.Supp. 470, 476 (E.D.Mich.1993). State agency involvement after all primary decisions have been made— indeed, only after the cleanup has gone somewhat awry—does not "constitute the public comment contemplated by the CERCLA regulations." Id.

■ PSCO argues alternatively that it substantially complied with the public comment requirements outlined in the regulations. Specifically, PSCO claims that once the cleanup operation began, it posted signs featuring a phone number for "questions about site activities" on the fence around the Barter site. PSCO further states that it had appointed spokespersons who fielded the eight to ten inquiries which PSCO received about the project, and notes that a local newspaper wrote an article about the cleanup in April 1993. Significantly, however, all of these efforts occurred after the cleanup was already well-underway. The NCP public comment requirement, on the other hand, tracks the stages of project development so that the community may be involved throughout the process. To the extent practicable during the remedy selection process, prior to commencing field work on the remedial investigation, the "lead agency" [5] (in this case, PSCO) is instructed to do the following [6]: (1) conduct interviews with local officials community residents, public interest groups, or other interested or affected parties regarding their interests and concerns; (2) prepare a formal CRP to "ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions," determine activities to "ensure such public involvement," and educate the public; and (3) inform the community of the availability of technical assistance grants. 40 C.F.R. § 300.430(c)(2). The lead agency may, additionally, permit other PRPs to participate in the CRP which it has implemented and may conduct technical discussion involv-

---

5. The NCP uses the term "lead agency" to denote the governmental entity which is performing the cleanup. In private-party response actions, however, a private party may supplant the governmental function and become bound by all the regulations which generally apply to the lead agency. See VME Americas, Inc., 946 F.Supp. at 690 n. 5.

6. The regulations also require the lead agency to establish an information repository at or near the location of the response action. 40 C.F.R. § 300.430(c)(2)(iv). Despite defendants' assertions to the contrary, however, as a private party initiating a response action, PSCO is not subject to this additional requirement. See 40 C.F.R. § 300.700(c)(6).

ing PRPs and the public. 40 C.F.R. § 300.430(c)(3)-(4). When selecting a remedy, the lead agency must present its proposed plan to the public. 40 C.F.R. § 300.430(f)(2). The regulations further explain that "[t]he purpose of the proposed plan is to supplement the [remedial investigation/feasibility study] and to provide the public with a reasonable opportunity to comment on the preferred alternative for remedial action, as well as alternative plans under consideration, and to participate in the selection of remedial action at a site." *Id.* The NCP mandates even more specific "[c]ommunity relations to support the selection of a remedy." These include (1) publishing a notice of availability of the proposed remedy in a "major local newspaper of general circulation," (2) providing a thirty-day "public comment period" for submission of written and oral comments on the plan, (3) holding a public meeting during this period (and making a transcript of the meeting available), (4) preparing a written summary of comments received and the response to them, and finally (5) documenting and making available (through a published notification), the final remedy decision in a "Record of Decision" ("ROD"). 40 C.F.R. § 300.430.

It is undisputed that PSCO failed to meet the bulk of these NCP public comment specifications for remedial actions. Most notably, none of PSCO's public notice or comment activities occurred prior to the cleanup itself or integrated the community in the decision-making process. PSCO's actions were, at best, merely responsive to concerns raised after the public initiated contact with PSCO. While courts have held that entities which made no effort at all to include the community in their cleanup process did not comply with the NCP, the facts here present a somewhat different scenario: PSCO did *a few* things. *Cf. County Line Inv. Co.,* 933 F.2d at 1514 (finding failure to comply with NCP where there was no attempt to comply with the public comment requirement); *VME Americas, Inc.,* 946 F.Supp. at 691; *Rhodes,* 833 F.Supp. at 1187. Accordingly, I do not find that PSCO failed to substantially comply with the whole NCP based solely on this part of the record, for there are several other procedural hurdles involved in NCP. I there-fore deny defendants' motions for summary judgment on the basis of the public comment provision alone. I turn, however, to the motions for summary judgment based on a more complete analysis of PSCO's NCP compliance.

### ii. Other NCP Requirements

As explained above, the NCP has three areas of regulation beyond the public comment requirement. At issue here are only the requirements for the lead agency to (1) identify ARARs, and (2) perform a feasibility study and remedy selection according to the regulations. First, defendants allege that PSCO failed to identify key ARARs to govern its cleanup activities. ARARs are defined as "those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site." 40 C.F.R. § 300.5; *see also United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1440 n. 30 (6th Cir.1991) (giving diverse examples of ARARs). To demonstrate this point, defendants note that the CDH drew "Conclusions of Law" in its Consent Order stating, "[PSCO]'s storage of a characteristic hazardous waste in waste piles without a permit or interim status from [CDH] or the EPA constitutes a violation of [Colo.Rev.Stat. §§ 25–15–308(1)(b) (1988 Supp.)] and [6 Colo.Code Regs. 1007–3 § 100.10]." (D & RG's Second Br., Ex. 25 [Consent Order § 42].) Defendants state that PSCO's legal violation is "undisputed," (*Id.* at 11), and that, moreover, PSCO's "own response to CDH's allegations acknowledge[s] that it was out of compliance with hazardous waste laws." (*Id.* at 14 [quoting evidence from record wherein PSCO employees and contractors acknowledge PSCO's violation].) Still, PSCO aptly responds that the CDH "finding of fact" is not, nomenclature notwithstanding, an undisputed fact. PSCO notes that the CDH has issued no "Notice of Violation," nor has there been an adjudication of any violation. The Consent Order explicitly stated that PSCO "does not admit

to any of the factual or legal determinations made by [CDH] herein, and any action pursuant to this [Consent Order] shall not constitute an admission of liability by [PSCO] with respect to the conditions of the Barter facility property." (*Id.*, Ex. 25 [Consent Order § 44].) I find there to be a genuine dispute of material fact regarding PSCO's compliance with the ARAR aspect of the NCR.

The Gates defendants and D & RG also argue that PSCO neglected to follow other procedural aspects of the NCP governing analysis and development of remedial actions. Specifically, they assert that PSCO failed to conduct an remedial investigation and feasibility study according to the guidelines established in 40 C.F.R. § 300.430. The regulations state that the purpose of the remedial investigation is "to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). PSCO acknowledges that it produced no actual remedial investigation/feasibility study document, but contends that the ERM and USPCI reports it offered (in part) as exhibits were the functional equivalent of an remedial investigation/feasibility study. (Pl.'s Resp. to D & RG's Second Br., Ex. 3 [Environmental Assessment], Ex. 17 [USPCI Workplan].) As stated above, the purpose of an remedial investigation/feasibility study is to prepare for the selection of a remedial operation. The USPCI Workplan, which describes a proposed methodology for the soil excavation and on-site stabilization of the Barter cleanup, is what the statute calls a "proposed plan" used to "supplement the [remedial investigation/feasibility study]" after the lead agency has selected its "preferred remedy." 40 C.F.R § 300.430(f)(2). Thus, it does not provide the information contemplated by a remedial investigation/feasibility study. I therefore analyze only the Environmental Assessment for its compliance with the remedial investigation/feasibility study standards.

As indicated above, the experts with whom PSCO contracted to create the "functional equivalent" to the remedial investigation/feasibility study suggested that "[b]ecause of the large volume of materials identified at the site that require cleanup, a thorough cost evaluation and feasibility study of several options should be completed." (Pl.'s Resp. to D & RG's Second Br., Ex. 3 [Environmental Assessment at 25].) ERM described its recommendations as "a preliminary evaluation of soil removal." (*Id.*, Ex. 3 [Environmental Assessment at 25].) ERM also warned that its studies of lead contamination were limited, stating that "the prepared lead volume estimates should be considered ballpark in nature (plus or minus 50%)." (*Id.*, Ex. 3 [Environmental Assessment at 27].) Accordingly, ERM advised, "[f]urther lead soil testing across the site and at different depths would be required to develop a precise estimate of the impact." (*Id.*, Ex. 3 [Environmental Assessment at 27].) PSCO declined to do further testing of lead contamination at that point, and therefore mischaracterized the nature of the problem. Only after the remedy had been chosen and excavation had already begun did PSCO discover that, in fact, the soil it had stockpiled included hazardous levels of lead waste. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Undisputed Fact ¶¶ 20, 21.) This discovery resulted in a complete overhaul of PSCO's original plan at the direction of CDH. (Pl.'s Resp. to D & RG's Second Br., Statement of Additional Undisputed Fact ¶¶ 20, 21, 24.) Had it been impossible for PSCO to anticipate or undertake these additional studies, it might not be held accountable for its insufficient analysis. In *United States v. Broderick Investment Company*, 963 F.Supp. 951 (D.Colo.1997), the court found that, although the lead agency had substantially mischaracterized the nature and extent of the hazardous waste, "numerous documents in the record indicate that obtaining an accurate measure of solid concentration would have been prohibitively expensive and time consuming, if not practically impossible." *Id.* at 954. In contrast, the record in the case at bar provides no credible reason why PSCO could not have performed additional studies "to characterize the nature and threat posed by the hazardous substances." 40 C.F.R. § 300.430(d)(2). None of ERM's suggestions above indicated

that further study would be practically infeasible or environmentally dangerous.

I further find that PSCO did not substantially comply with the NCP requirements on the development and analysis of alternative courses of action. Defendants allege that PSCO did not conduct a sufficiently detailed analysis of possible remedial alternatives. "The failure of a party seeking cost recovery under CERCLA to perform an remedial investigation/feasibility study, and all the analysis and investigation that it implies, defeats a claim of substantial compliance with the NCP." *Hamtramck*, 840 F.Supp. at 477 (citing *inter alia, Channel Master*, 748 F.Supp. at 387["[A]bsence of a proper [remedial investigation/feasibility study] defeats a claim of compliance with the NCP."]). The NCP first instructs lead agencies to determine their objectives according to a "site-specific baseline risk assessment" created during the remedial investigation, ARARs, and additional NCP specifications organized according to the type of environmental problem encountered. 40 C.F.R. §§ 300.430(d)(4), (e)(2)(i)(A)(1)-(6). Next, the alternatives generated must undergo an evaluation against three criteria—effectiveness, implementability, and cost—each of which is then described at length. 40 C.F.R. § 300.430(e)(7)(i)-(iii). Finally, the NCP mandates a further "detailed analysis of alternatives" on a limited number of alternatives "that represent viable approaches to remedial action." 40 C.F.R. § 300.430(e)(9)(i)-(ii). The analysis must consider the following factors (in order of importance): (1) overall protection of human health and the environment; (2) compliance with ARARS; (3) long-term effectiveness and permanence; (4) reduction of toxicity, mobility or volume through treatment; (5) short-term effectiveness; (6) implementability; (7) cost; (8) state acceptance; and (9) community acceptance. 40 C.F.R. § 300.430(e)(9)(iii).

ERM's Environmental Assessment contains a section titled "Clean-up Options" which (1) refers to some federally-set ARARs as "Clean-up Goals," (2) presents a cursory evaluation of potential exposure risks, and (3) lists six potential "remedial techniques." (Pl.'s Resp. to D & RG's Second Br., Ex. 3 [Environmental Assessment at 21–24].) The Environmental Assessment then compares the cleanup alternatives according to cost, liability, and future use. (*Id.,* Ex. 3 [Environmental Assessment at 24–25].) While this analysis suggests *some* compliance, I do not find it suggestive of *substantial* compliance with the NCP. The alternatives are each addressed in short paragraphs—hardly the sort of in-depth consideration which the NCP envisions. Even soil removal, the one option discussed most fully because the Environmental Assessment chose to recommend it, includes only a "preliminary evaluation" of cost and implementability. (*Id.,* Ex. 3 [Environmental Assessment at 25–27].) Likewise, in their deposition testimony, PSCO officials mentioned a few other concerns which affected their decision-making, but offered no evidence of the sort which the NCP articulates at length. *See, e.g.,* Pl.'s Resp. to D & RG's Second Br., Statement of Additional Disputed Material Facts ¶ 13 and citations therein. For instance, PSCO's three bases of comparison reveal concerns quite different from those established in the NCP. Rather than a focus outward on the community and the environment, PSCO's concerns—in the Environmental Assessment and the depositions—tend to focus on its own business interests in clearing its name at an affordable price. A similar lack of detail with regard to the threat to the public and the environment was fatal to the plaintiff's claim in *Hamtramck*, 840 F.Supp. at 478. Moreover, nothing beyond the Environmental Assessment appears to document the process or reasons PSCO used to arrive at its choice of remedies. PSCO offers no such document, and the evidence indicates that none was prepared. (D & RG's Second Br., Ex. B [Vonesh Dep. at 150].) In this respect, the case parallels *Channel Master,* where the court stated, "cursory examination and rejection of alternatives does not demonstrate 'development' of alternatives as called for under the NCP." 748 F.Supp. at 389; *see also Amland Properties Corp. v. Aluminum Co. of Am.,* 711 F.Supp. 784, 800–01 (holding that plaintiffs provided insufficient documentation on cleanup alternatives not adopted).

In summarizing their CERCLA argument, defendants also rely, by way of analogy, on

the facts of *Washington Natural Gas*. In that case, too, the court found that the plaintiff first ran afoul of the NCP because its geotechnical consultant's false assumptions in the initial site investigation led to a "drastically underestimated" remedial plan.[7] *Id.*, 59 F.3d at 803. Yet, the court did not preclude the plaintiff's recovery without further consideration of other NCP requirements, including the development and screening of remedial alternatives and the public comment requirement. Here, too, it is the conjunction of PSCO's insufficient remedial investigation/feasibility study and its meager attempt to fulfill the public comment requirement which makes PSCO unable to substantially comply with the NCP as a whole. Accordingly, PSCO is barred from contribution under CERCLA. Courts have deemed compliance with NCP requirements important enough to deny relief to individual parties seeking response costs, even where several parties may have been liable for causing the environmental damage. *See, e.g., County Line Inv. Co.*, 933 F.2d at 1517; *VME Americas, Inc.*, 946 F.Supp. at 692 (denying party relief under CERCLA for failure to substantially comply with the NCP); *Yellow Freight Sys., Inc. v. ACF Indus., Inc.*, 909 F.Supp. 1290 (E.D.Mo.1995) (same); *Channel Master*, 748 F.Supp. at 393 (same). In this case, PSCO is subject to the higher, remedial cleanup standard because it had the opportunity to plan for more contingencies and to engage the affected community. PSCO fell far short of this gauge; to hold otherwise would render the careful outline of the NCP meaningless. I therefore grant the defendants' respective summary-judgment motions on these grounds.

### 3. Divisible Liability

Under CERCLA, the court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C.A. § 9613(f)(1). The Gates defendants move for summary judgment on this issue, arguing that, because the Barter site is comprised of separate lots for which cleanup expenses are divisible, their damages ought to be limited to areas for which they are found liable as actual contributing polluters. D & RG also moves for partial summary judgment on "the grounds stated in the Gates Defendants' Brief ... as to the divisible nature of liability on a lot-by-lot basis." (D & RG's Second Mot. for Summ. J. at 3.) As the evidence in the Gates defendants' motion is specific to Gates, however, and D & RG did not "supplement the record as to D & RG's liability for particular lots once the deadline for completion of depositions [had] passed," *id.*, I deny D & RG's motion for partial summary judgment on this issue without further analysis. Furthermore, because I have granted summary judgment for defendants on all outstanding issues of liability, I deny the motions for partial summary judgment on the issue of divisibility of damages as moot.

### 4. UCATA

Having disposed of all federal-law issues in this matter, I now turn to PSCO's UCATA claim. Under 28 U.S.C.A. § 1367(c), a federal court has discretion to decline to exercise supplemental jurisdiction over state-law claims where "the district court has dismissed all claims over which it has original jurisdiction." In this case, I have dismissed all claims over which this court had original jurisdiction under 28 U.S.C.A. §§ 1331 and 1346, and 42 U.S.C.A. § 9613(b). Only PSCO's UCATA claim, raised under Colorado law, survives. Colo.Rev.Stat. § 13–50.5–102(1). I decline to exercise supplemental jurisdiction over the remaining UCATA claim. Accordingly, defendants' motions for summary judgment on the UCATA issue will not be addressed. The claim will be dismissed for want of subject matter jurisdiction.

### 5. Conclusion

Based on the foregoing, it is therefore

---

7. In *Washington Natural Gas*, 59 F.3d at 802, the court analyzed the case according to the 1982 and 1985 NCP standards. As indicated above, the standard of compliance for the 1990 NCP has since become one of "substantial compliance," but the substantive regulations at issue here have remained largely the same for all three versions. *See also id.* at 802–805 (finding parallel citations for all relevant aspects of the NCP except the public comment requirement, added in 1985.)

ORDERED as follows:

1. The Gates defendants' first motion for summary judgment, on the issue of PSCO's failure to comply with the public comment element of the NCP, is DENIED.

2. D & RG's first motion for summary judgment, on the issue of PSCO's failure to comply with the public comment element of the NCP, is DENIED.

3. The Gates defendants' third motion for summary judgment, on the issue of PSCO's failure to comply with the NCP as a whole, is GRANTED.

4. The Gates defendants' second motion for summary judgment, on the issue of divisibility of damages, is DENIED as moot.

5. D & RG's second motion for summary judgment is GRANTED in part and DENIED in part, as stated below.

6. D & RG's second motion for summary judgment, on the issue of PSCO's failure to comply with the NCP as a whole, is GRANTED.

7. D & RG's second motion for summary judgment, on the issue of divisibility of damages, is DENIED as moot.

8. The clerk shall enter judgment for defendants and against plaintiff, dismissing with prejudice the claim arising under CERCLA.

9. The claim against defendants arising under UCATA is dismissed without prejudice for lack of subject matter jurisdiction.

10. Defendants shall leave their costs upon the filing of a bill of costs with the clerk within eleven days from the date of this order.