**SOUTHFUND PARTNERS III, Plaintiff,**

v.

**SEARS, ROEBUCK AND CO., Defendant.**

**No. CIV.A. 1:97–CV–1058–RWS.**

United States District Court, N.D. Georgia, Atlanta Division.

July 30, 1999.

Janney E. Sanders, Adams, Clifton, Sanders & Smith, Toccoa, GA, for Plaintiff.

Jay Michael Barber, David Andrew Hughes, Ogletree, Keakins, Nash, Smoak & Stewart, Atlanta, GA, for Defendant.

### MEMORANDUM OPINION & ORDER

STORY, District Judge.

Plaintiff Southfund Partners III ["Southfund"] brought this action against Defendant Sears, Roebuck and Company ["Sears"] to recover costs associated with the cleanup of property formerly owned by Sears under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ["CERCLA"] and the Georgia Hazardous Site Response Act, O.C.G.A. § 12–8–90 et seq. ["HSRA"]. Before the Court are Defendant's Motion for Summary Judgment [13–1] and Defendant's Motion to Withdraw or Amend Admissions [20–1]. As an initial matter, the Court grants Defendant's Motion to Withdraw or Amend Admissions. After reviewing the entire record and considering all arguments of the parties, this Court enters the following Order.

## I. Factual Background

### A. Discovering the Contamination.

Sears purchased a two-story brick building at the corner of Ponce De Leon Avenue and Glen Iris Drive in Atlanta, Georgia from a large local laundry and dry cleaning company in 1966. (Ricketts Dep. at Ex. 1.) The building served as the main plant for the laundry company, but Sears converted the building into a carpentry shop and used it as such until Sears sold the property to Southfund in November of 1988. (Ricketts Dep. at Ex. No. 1; Ricketts Aff. at ¶ 3.) By December of 1988, Southfund discovered and arranged for the removal of three underground storage tanks—two 500 gallon solvent tanks on the north side of the building and one approximately 20,000 gallon fuel tank on the south side.[1] (Holton Dep. at Ex. No. 7, Hellinger Aff. at ¶¶ 4–6 & Ex. B.) In 1991—over two years after Southfund removed the tanks—the United States Postal Service considered purchasing the property from Southfund, but declined after conducting an investigation that revealed substantial contamination in two plumes located on the property. (Smithgall Dep. at Ex. No. 2, Smithgall Aff. at ¶ 6.)

Gregory Holton, Southfund's expert who also oversaw most of the cleanup effort, opined that the discharge of dry-cleaning solvents from the solvent tanks caused the contamination found in Plume A; Holton traced the contamination in Plume B to the fuel tank. (Smithgall Aff. at ¶ 6; Holton Dep. at 86–89, 91, Ex. No. 14.) Using a mathematical model, Holton concluded the contamination found in Plume A resulted from dry cleaning fluids and solvents being introduced into the soil between the years 1978 and 1984, during the time Sears owned the property. (Holton Dep. at 15, 32–35.) As Holton described it, the solvent materials escaped from the two solvent tanks as rainwater filled the tanks and displaced them, causing the materials to contaminate the soil and move into the groundwater. (Holton Dep. at 45.) This conclusion is supported by testimony of Joe Hellinger, the person Southfund paid to remove the solvent tanks. He testified that, at the time of their removal, the solvent tanks had no cap or cover on them and were filled with rainwater that had "evidently over the years forced out whatever material had been kept in the tanks into the surrounding area." (Hellinger Aff. at ¶ 5.)

In the summer of 1994, the Georgia Department of Natural Resources ["DNR"] examined the site, concluded a reportable quantity of hazardous substances had been released, and placed the property on its Hazardous Site Inventory ["HSI"]. (Smithgall Dep. at Ex. No. 42.) Numerous factors are considered to determine whether a release constitutes a reportable quantity, including the extent to which the contaminated portion of the property is accessible. In a July 14, 1994 letter to DNR, Southfund's legal counsel pointed out that the contaminated portion of the property was enclosed in a fence—a mitigating factor not reflected in DNR's initial analysis—and explained this fact should lower DNR's assessment of the release from a reportable to a non-reportable quantity. (Smithgall Dep. at Ex. No. 42.) Southfund also stated in the letter that "additional factors" aside from the limited access could "cause the site's . . . score to be lowered even further." (Smithgall Dep. at Ex. No. 42.) DNR responded on August 5, 1994, agreeing that "a release exceeding a reportable quantity has not occurred at this site[,]" and removing the property from the HSI. (Smithgall Dep. at Ex. No. 42.)

### B. Southfund's Initiation of Cleanup Efforts.

One year after DNR removed the property from its HSI, Southfund employed

---

1. An eyewitness to the removal described the solvent tanks as being "of the type utilized in dry cleaning establishments to store dry cleaning fluids." (Hellinger Aff. at ¶ 9.) They were cone-shaped and positioned so that their tops protruded from the ground. (Hellinger Aff. at ¶ 5.)

Industrial Compliance ["IC"] to begin remedial action in the fall of 1995. (Smithgall Aff. at ¶ 6.) Southfund decided to clean the site for two reasons: (1) doing so would enhance the marketability of the property: (2) the possibility DNR could add the property to the HSI once again if access to the contaminated area became unrestricted. (Smithgall Dep. at 149.) The remedial action taken by Southfund consisted of three components. First, IC installed a series of extraction wells used to pump contaminated groundwater from the property into the city sewer system. (Holton Dep. at 74.) Second, IC drilled sparging wells and injected air into the plume to increase the rate of decay of hazardous materials in the soil. (Holton Dep. at 74–75.) Third, IC used a vacuum extraction system to remove air from areas near the sparging wells. (Holton Dep. at 75.)

### C. Sears's Knowledge of the Solvent Tanks and Fuel Tanks During its Ownership of the Property.

Mr. James Ricketts, Sears's superintendent over the building in question during the entire time Sears owned it, testified that neither he nor anyone else associated with Sears knew of "any contamination on any part of the property occurring during or before the period of Sears' ownership." (Ricketts Aff. at ¶ 4.) In addition, no one at Sears knew during Sears's ownership of the property the underground solvent tanks and fuel tank[2] were even located on the property. (Ricketts Aff. at ¶ 4.) But a May 3, 1950 plat Sears possessed indicates the existence of three solvent tanks—two 500 gallon tanks and one 1000 gallon tank—and two fuel tanks—one a 3900 gallon tank and the other a 18,000 gallon tank—in the same location where Southfund found and removed the two 500 gallon

solvent tanks and the approximately 20,000 gallon fuel tank.

### D. The "As Is" Provision in the Sales Contract.

John Smithgall, an experienced real estate investor, purchased the property on behalf of Southfund for investment purposes. Smithgall knew from the outset of negotiations with Sears that the subject building was referred to as the "laundry building," but explained in his deposition that he simply believed at the time that clothes had only been laundered on site; he did not realize that a dry-cleaning business, complete with all the harsh chemicals associated therewith, had operated out of the building. (Smithgall Dep. at 37–38.) Southfund agreed to purchase the property "as is," the sales contract stating as follows:

> The Property and the improvements thereon, including, but not limited to, the T.V. Building and the Laundry building shall be conveyed by Seller to Purchaser in "as is" condition and Seller makes no warranties or representations regarding the condition of the Property or said buildings or improvements except as set out in this Paragraph.

(Smithgall Dep., Ex. No. 1.) The contract gave Southfund the right to conduct soil and subsurface testing during the 105 day period before closing. (Smithgall Dep. at 36–38, 42–43.) Southfund did not, however, conduct any such tests. Smithgall explained he understood the term "soil and subsurface testing" to encompass only tests that analyze the property's soil composition to determine whether the property can support the construction of a building; because Southfund did not intend to construct any buildings on the site, these tests were unnecessary. (Smithgall Dep. at 43–45.)

---

2. Ricketts does recall Sears installing a 5000 gallon underground gasoline tank and a gasoline pump on the parcel for Sears executives to fill their company cars. But Sears removed the pump and tank in either 1981 or 1982. (Ricketts Dep. at 25–30.) Southfund

believes that Sears simply used the preexisting fuel tank, and points out that Ricketts described the Sears fuel tank as being located in the same area where the fuel tanks indicated on the 1950 plat were located. (Ricketts Dep. at Exs. No. 1, 4; Ricketts Dep. at 56–57.)

## II. Discussion

### A. Whether Southfund's Claims Are Barred by the "As Is" Provision of the Sales Contract?

As a threshold matter, the Court considers Sears's argument that Southfund released Sears from any CERCLA and HSRA liability by purchasing the property from Sears "as is." But the Court must first decide whether Georgia law should be applied to determine this issue with regard to Southfund's CERCLA claims. Federal law governs the issue of whether an agreement releases a defendant from liability under a federal statute. *Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 108 (3rd Cir.1994) (*citing Dice v. Akron, Canton & Youngstown R. Co.*, 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952)). "The Supreme Court has cautioned, however, that controversies governed by federal law 'do not inevitably require resort to uniform federal rules.'" *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1500 (11th Cir.1996) (*quoting United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979)). Instead, district courts must determine whether to craft uniform federal common law rules or adopt applicable state law rules to fill in federal statutory gaps by considering the following factors: "(1) whether there exists a need for a nationally uniform body of law; (2) whether application of state law would frustrate important federal policy; and (3) any impact a federal common law rule would have on existing relationships under state law." *Id.* (*quoting Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. at 1458–59).

Five courts of appeals have applied these factors to determine whether state or federal common law should govern the construction of contractual releases of CERCLA liability, and all five concluded state contract and release law should apply. *Beazer East, Inc. v. The Mead Corp.*, 34 F.3d 206 (3rd Cir.1994), *cert. denied*, 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559, (1995); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 14–15 (2nd Cir.1993); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 406 (1st Cir. 1993); *United States v. Hardage*, 985 F.2d 1427, 1433 n. 2 (10th Cir.1993); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457–60 (9th Cir.1986). The reasoning expressed in these opinions is persuasive, and the Court concludes Georgia law should govern the determination of whether the "as is" clause in the sales contract releases Sears from CERCLA liability.

Because "as is" provisions in Georgia only relieve the seller from liability on breach of warranty claims, Southfund has not waived its right to recover from Sears under CERCLA or HSRA. Georgia courts construe "as is" provisions as agreements between parties that "'the buyer takes the article in its then present state or condition without any implied warranty as to soundness of condition or suitability for the use or purposes intended.'" *Hutchinson Homes, Inc. v. Guerdon Industries, Inc.*, 143 Ga.App. 664, 665, 239 S.E.2d 553 (1977). "As is" provisions thus act as disclaimers in the context of consumer goods transactions that prevent buyers from recovering against sellers on a breach of warranty theory. *See, e.g. Perrett v. Dollard*, 176 Ga.App. 829, 830, 338 S.E.2d 56 (1985) (upholding dismissal of home buyer's breach of warranty claim because "as is" provision excluded any implied warranties); *Joseph Charles Parrish, Inc. v. Hill*, 173 Ga.App. 97, 325 S.E.2d 595 (1984) (upholding dismissal of breach of implied warranty claim brought by purchaser of used vehicle because "as is" provision in sales contract excluded all implied warranties); *Hutchinson Homes*, 143 Ga.App. at 665, 239 S.E.2d 553 (upholding dismissal of mobile home buyer's warranty claim; no warranties existed because buyer purchased mobile home "as is").

"As is" provisions do not, however, release a seller from liability on non-warranty claims. *See Joseph Charles Parrish, Inc. v. Hill*, 173 Ga.App. 97, 98, 325 S.E.2d

595 (1984) (affirming grant of summary judgment to used car dealer on buyer's breach of warranty claims because of "as is" provision in sales contract, but overturning dismissal of purchaser's statutory cause of action against dealer for unlawfully tampering with odometer). Southfund may therefore seek recovery under CERCLA and HSRA even though it purchased the property from Sears "as is."

Every district court that has considered the effect of an "as is" provision in a real estate sales contract on a buyer's CERCLA claim under federal or state common law has reached this same conclusion. *See, e.g. Wiegmann & Rose Intern. Corp. v. NL Industries,* 735 F.Supp. 957, 961 (N.D.Cal.1990) (holding that "as is" clause only precluded liability for breach of warranty and did not release transferee's strict liability claim under CERCLA, noting that contrary conclusion would frustrate CERCLA policy of requiring responsible parties to bear costs of remedying conditions they created); *Allied Corp. v. Frola,* 730 F.Supp. 626, 629 (D.N.J.1990) (concluding that "as is" clause in security deed did not defeat strict liability claim by buyer under CERCLA); *International Clinical Labs. v. Stevens,* 710 F.Supp. 466, 469 (E.D.N.Y.1989) (holding that under New York law "as is" clause only bars breach of warranty claims, not CERCLA claims); *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1001 (D.N.J.1988) (applying New Jersey law and concluding that "as is" clause does not shift liability from one party to another in cause of action not based on breach of warranty).

The cases cited by Sears in support of their argument that "as is" clauses constitute a release of CERCLA liability are totally distinguishable; far from simply stating the property is sold "as is," the sales contracts considered by these courts explain rather clearly that the buyer agrees to release the seller from any and all liability. *See Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1461 (9th Cir. 1986) (concluding that agreement released defendant from CERCLA liability where it not only absolved liability "for claims 'based upon or arising out of the Purchase Agreement'" but also for "all claims 'in any way connected'" with sale); *FMC Corp. v. Northern Pump Co.,* 668 F.Supp. 1285, 1292 (D.Minn.1987) (finding that release absolved defendant from potential CERCLA liability by releasing defendant "'from *all* claims, demands, and *causes of action* which [seller] has, had, or *may have'*" arising from sale).

## B. The Merits of Southfund's CERCLA Claims.

Congress enacted CERCLA "to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the disposal of chemical poison.'" *U.S. v. Fleet Factors Corp.,* 901 F.2d 1550, 1553 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991) (*quoting Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1315–16 (11th Cir.1990)). Southfund seeks recovery of all its cleanup costs from Sears under sections 107(a) of CERCLA or, in the alternative, contribution from Sears under section 113(f).[3] The distinction is one without a difference for purposes of this Order, however, because "[t]he elements of a claim under both sections are the same." *Redwing Carriers,* 94 F.3d at 1496.

To prevail on a CERCLA claim, a plaintiff must show that: (1) the defendant is a "covered person" under § 107(a) of CERCLA; (2) a release or threatened release of a hazardous substance has occurred; (3) the release or threatened re-

---

**3.** A person may recover all necessary cleanup costs from those responsible for the contamination under section 107(a) so long as the person seeking recovery shares no blame for the contamination. 42 U.S.C. § 9607(a)(4); *Redwing Carriers,* 94 F.3d at 1496. Section 113(f), in contrast, allows a person to "seek contribution from any other person who is liable or potentially liable under section 9607(a) [107(a)] of this title ...." 42 U.S.C. § 9613(f).

lease has caused the plaintiff to incur necessary response costs consistent with the "national contingency plan" ["NCP"]; and (4) the site in question is a 'facility' as defined in § 101(9) of CERCLA, 42 U.S.C. § 9601(9) (1995). *Id.* at 1496–97. Conceding prongs two and four, Sears contends Southfund cannot satisfy prongs one and three. For the reasons expressed below, the Court finds Sears is a covered person under CERCLA given the undisputed fact that hazardous materials leaked out of the tanks and into the soil during Sears's ownership of the property. At the same time, however, no reasonable juror could find Southfund's response costs were either necessary or incurred in a manner consistent with the NCP. Sears is therefore entitled to dismissal of Southfund's CERCLA claims.

### 1. Is Southfund a Covered Person?

■ Section 107(a)(1)-(4) defines four classes of parties that fall within the definition of "covered persons" and may be held liable under CERCLA. Southfund concedes Sears does not fit within the classes described in subsections (1), (3), and (4), but argues Sears qualifies under subsection (2) as a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2) (1995). Holton opined the solvents leaked or spilled from the tanks during Sears's ownership of the property, and both sides agree the solvents are hazardous materials; the question therefore becomes whether those leaks constitute a "disposal."

The Court finds the term "disposal" includes the leaking and spilling of hazardous materials from an uncapped tank caused by rainwater displacing the hazardous materials. CERCLA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constitu-

ent thereof may enter the environment or be admitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29) (1995) (incorporating by reference definition of "disposal" provided in section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903) (emphasis added). Spilling and leaking are expressly included within this definition.

Sears argues no "disposal" occurred during the time it owned the property even if hazardous materials leaked or spilled from the tanks because Sears never knew about the tanks or the leaks and never actively participated in any activity that caused the leaks to occur. Based upon these assertions, Sears characterizes the contamination which took place during its ownership of the property as passive migration. This characterization, however, understates what transpired during Sears's ownership of the property. The evidence, when viewed in a light most favorable to Southfund, reveals Sears knew or should have known the solvent tanks were located on the property and acted unreasonably by ignoring the tanks during the twenty-two years they filled with rainwater and released solvents.

Ricketts testified that neither he nor anyone else at Sears knew about the existence of the solvent tanks. But two facts in the record could lead reasonable jurors to conclude Sears knew or should have known. First, a May 3, 1950 plat in Sears's possession indicates the existence of the solvent tanks on the northern side of the building. (Ricketts Dep. at Ex. No. 4.) Second, the evidence suggests the tanks were not concealed; to the contrary, the tops of the tanks protruded from the ground, (Hellinger Aff. at ¶ 5.), thus enabling Southfund to find the tanks and arrange for their removal within one month of purchasing the property from Sears. Given these undisputed facts, reasonable jurors could certainly find Sears knew or should have known of the tanks' existence during the twenty-two year period it owned the property and acted unrea-

sonably by failing to cap the tanks or remove them before rainwater displaced the solvents and caused the solvents to leak or spill.

Sears argues for an interpretation of the term "disposal" that excludes spills or leaks of hazardous materials in instances when the landowner did not commit affirmative acts to cause the spill or leak. Such a narrow interpretation of the term "disposal" would permit a landowner to contaminate the environment by ignoring open drums of hazardous materials on his property while rainwater displaced the materials and caused them to spill onto the ground. Permitting a landowner to avoid liability in this context simply because it did not actively participate in the contamination would "frustrate the statutory policy of encouraging 'voluntary private action to remedy environmental hazards.'" *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 844–47 (4th Cir.1992), *cert. denied*, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992) (*quoting In re Dant & Russell, Inc.*, 951 F.2d 246, 248 (9th Cir.1991)). The Court therefore rejects Sears's narrow reading of the term "disposal," and, in doing so, heeds the Eleventh Circuit's admonition that, "[i]nstead of parsing the language of this definition to arrive at a rigid rule for when conduct results in a 'disposal,' courts should look at the definition of 'disposal' in its entirety in ascertaining whether a particular event qualifies as such." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1510 (11th Cir.1996).[4]

Contrary to Sears's assertion, the vast majority of courts to address the issue have concluded a landowner is a "covered person" if it owned property when hazardous materials leaked or spilled out of containers and into the environment regardless of whether it committed affirmative acts to cause the leak or spill.[5] *See Nurad*, 966 F.2d at 844–47 (concluding defendant landowners were "covered persons" solely because hazardous materials leaked from tanks during their ownership or property, stating that only a "strained reading" of the term "disposal" would limit its meaning to active human conduct); *Briggs & Stratton Corp. v. Concrete Sales & Servs.*, 20 F.Supp.2d 1356, 1370 (M.D.Ga.1998) (concluding defendant landowner was liable under CERCLA "as a former owner during the period of time that hazardous substances leaked from the containers that were abandoned on the property."); *Howes v. W.R. Peele*, 876 F.Supp. 733, 745 (E.D.N.C.1995) (concluding disposal occurred on property owned by defendant simply because leaks oc-

**4.** Sears argues the *Redwing* court rejected an interpretation of the term "disposal" that would hold liable landowners who did not commit affirmative acts to cause the disposal. In *Redwing*, the court held that a prior landowner was not liable because there was no evidence it had done or failed to do anything that resulted in a movement of contaminated soil. *Redwing*, 94 F.3d at 1510–11. In the case at bar, however, reasonable jurors could find Sears failed to cap the tanks and permitted them to fill with rainwater which resulted in the disposal of hazardous substances on the property.

**5.** A related issue has been the subject of a fair amount of debate: whether a "disposal" occurs if, during a defendant's ownership of land, hazardous materials that contaminated the ground before the landowner's purchase of the property migrate into uncontaminated areas or "leach" due to rainfall and other

natural phenomena? *Compare ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357–58 (2nd Cir.1997) (concluding that landowner is not liable under CERCLA where no spill or leak occurred during ownership of property because passive migration of hazardous materials during defendant's ownership of land does not constitute disposal); *and U.S. v. CDMG Realty Co.*, 96 F.3d 706, 714 (3rd Cir.1996) (holding that "passive migration at issue in this case cannot constitute disposal" under CERCLA) *with CPC Intern., Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1277–78 (W.D.Mich.1991) (concluding that "the unchecked spread of contaminated groundwater" constitutes disposal under CERCLA); *and Emhart Indus., Inc. v. Duracell Int'l, Inc.*, 665 F.Supp. 549, 574 (M.D.Tenn.1987) (finding that the spilling, dumping, and *leaching* of hazardous materials all constitute disposals under CERCLA).

curred thereon during defendant's ownership); *State of New York v. Almy Bros., Inc.*, 866 F.Supp. 668, 677 (N.D.N.Y.1994) (stating "it is irrelevant whether [defendant] moved the drum themselves, knew of their movement, or simply stood by and allowed the drums to deteriorate during the period of their ownership of the property" because "under any of these scenarios, the hazardous substances were disposed of on the property ...."); *Northwestern Mutual Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 398 (E.D.Va.1994) (concluding disposal occurred on property due to spilling and leaking of hazardous materials); *In Re Tutu Wells Contamination Litigation*, 846 F.Supp. 1243, 1281–82 (D.Vi.1993) (holding landowner liable as covered person because hazardous materials stored on property by previous landowner leaked into environment during defendant's ownership); *Stanley Works v. Snydergeneral Corp.*, 781 F.Supp. 659, 662–64 (E.D.Cal. 1990) (concluding ongoing leaking of hazardous substances constitutes a disposal under CERCLA); *United States v. Price*, 523 F.Supp. 1055, 1071 (D.N.J.1981), *aff'd*, 688 F.2d 204, (3rd Cir.1982) (stating this same definition, in context of Solid Waste Disposal Act claim, is "quite broad" and "includes within its purview leaking, which ordinarily occurs not through affirmative action but as a result of inaction of negligent past actions."). *But see U.S. v. Petersen Sand and Gravel, Inc.*, 806 F.Supp. 1346, 1349–53 (N.D.Ill.1992) (concluding CERCLA definition of "disposal" does not include "passive leaking").

## 2. The Necessity of the Response Costs.

■ CERCLA allows private litigants to recover from prior landowners only "necessary costs of response ...." § 9607(a)(4)(B). "To show that any response costs were necessary under the CERCLA, the plaintiff must show: '(1) that the costs were incurred in response to a threat to human health or the environment that existed prior to initiation of the response action and (2) that the costs were necessary to address that threat.'" *Foster v. U.S.*, 922 F.Supp. 642, 652 (D.D.C. 1996) (*quoting G.J. Leasing Co., Inc. v. Union Elec. Co.*, 854 F.Supp. 539, 561 (S.D.Ill.1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995)). *See also Yellow Freight Sys., Inc. v. ACF Indus., Inc.*, 909 F.Supp. 1290, 1299 (E.D.Mo.1995) ("[Plaintiff] must demonstrate that it was responding to a threat to public health or the environment."). As the Seventh Circuit has commented, "[t]he statutory limitation to 'necessary' costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else." *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir.1995).

Southfund's remedial efforts cleansed the soil and groundwater of the solvent contaminants. Sears contends Southfund conducted these remedial efforts not to reduce threats to human health or the environment, but, instead, to make the property more attractive to potential buyers. Sears points out that DNR removed the property from the HSI after weighing the risks associated with the contamination and concluding no reportable quantity of hazardous materials had been released. Southfund responded with the following argument.

> Sears is well aware that the removal from the HSI by the Georgia Department of Natural Resources was made only because the Property at that point was totally unaccessible, because it was completely surrounded by a fence and was covered in asphalt. As described in Dr. Holton's affidavit, at any time that the property was to be used for any other purpose where accessibility to human contact would result, the Georgia DNR would very quickly have placed the Property back on the HSI and would have required remedial action.

(Pl.'s Br. at 23.)

■ No reasonable juror could find, based on the present record, the response

costs incurred to cleanse the groundwater and soil were necessary to address threats to the public health or the environment. First, with respect to the contaminated groundwater, Southfund has produced absolutely no evidence to suggest it posed any threat to the environment or public health. As to the environment, nothing in the record suggests that animals or plants are adversely affected by the contaminated groundwater or that the groundwater contaminates any creeks, lakes, or ponds downstream. It may well be that the contaminants are greatly diluted or filtered out altogether. With regard to the public health, the record is bereft of any evidence that anyone drinks contaminated water from the site or that the groundwater flows into underground sources of drinking water and contaminates them. Without any such evidence, reasonable jurors could not find Southfund incurred response costs to cleanse the groundwater in response to a threat to the public health or the environment. *See Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 905 (5th Cir.1993) (concluding contaminated groundwater posed no threat to public health because "not one shred of evidence" indicated that anyone in area actually drank water at issue); *Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*, No. 94–0752, 1996 WL 557592 at *50–52 (E.D.Pa. Oct.1, 1996) (finding contaminated groundwater posed no threat to public health or environment because no evidence suggested that: (1) anyone used groundwater from site as source of drinking water or (2) that contaminants in groundwater increased contaminant levels in river or sources of potable water).

Second, no reasonable juror could find the contaminated soil posed a threat to the environment or the public health. Southfund has not even attempted to explain how the contaminated soil would pose a threat to the environment, and there no evidence to show the contaminated soil posed a danger to the public health. Instead, the undisputed facts are that the contaminated soil was covered with asphalt

and enclosed in a fence, which led Southfund to argue, and DNR to agree, that the area was not hazardous and did not require remedial efforts. Without any evidence DNR required the remedial efforts undertaken to ameliorate the effects of contamination, no reasonable juror could find the response costs to be necessary. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 990 F.Supp. 1188, 1193 (C.D.Cal. 1997) (concluding response costs were not necessary at time they were undertaken because representative of applicable regional environmental authority testified that "had plaintiff not voluntarily proposed the cleanup, we would not have ordered remedial action since the materials did not pose a health problem or a threat to the environment").

The record suggests Southfund may have removed the asphalt and fencing that prevented access to the contaminated soil in order to prepare the industrial site for residential use. Even assuming a threat to the public health and the environment would exist after removal of these barriers, the resulting response costs would certainly not be considered "necessary" under CERCLA. The Seventh Circuit addressed this very situation in *G.J. Leasing* and explained that landowners cannot remove contamination to upgrade the use of the property and then recover its response costs under CERCLA, stating in part as follows:

Suppose a building that was being used to warehouse heavy industrial equipment were found to have very low levels of contamination by some hazardous substance and only a small expenditure would be necessary to remove enough of the substance to make the building safe for its current use. Thinking this is a perfect opportunity to upgrade that use, the owners decide to incur enormous costs to eliminate the contamination utterly, charge those costs to whoever was responsible for the current very low level of contamination, and then convert the

building to a hospital, day care center, or dairy products plant. The limitation 'necessary' response costs would deter them from carrying out this scheme. 54 F.3d at 386. The facts in the case sub judice fall squarely within this hypothetical, the only difference being that absolutely no costs were necessary to make the property at issue safe for its current use as an industrial site.[6]

### 3. Consistency with the National Contingency Plan.

■ The National Contingency Plan ["NCP"] is a body of regulations governing the cleanup of hazardous waste sites under CERCLA. *Redwing Carriers*, 94 F.3d at 1496 n. 8. A private party seeking costs bears the burden of proving its actions were consistent with the NCP. *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir.1992). "[P]rivate party response action[s] will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements ... and results in a CERCLA-quality clean-up." 40 C.F.R. § 300.700(c)(3)(i). Consequently, a private

party's response action will not be considered inconsistent with the NCP "based on immaterial or insubstantial deviations" from these requirements. § 300.700(c)(4). To demonstrate substantial compliance with the NCP, the party must abide by the regulations that outline requirements for response action procedures and public comment concerning the selection of the response action. *Public Service Co. of Colorado v. Gates Rubber Co.*, 22 F.Supp.2d 1180, 1187 (D.Colo.1997) (citations omitted).[7]

Remedial actions are subject to a complex series of regulations. The *Gates Rubber* court succinctly summarized the applicable regulatory requirements as follows:

The NCP for private remedial actions has four primary requirements, each of which is detailed through extensive regulation: (1) identification of applicable or relevant and appropriate requirements ("ARARs") as mandated by 40 C.F.R. § 300.400(g); (2) remedial site evaluation, which may consist of two steps, including a remedial preliminary assess-

6. Many district courts have denied relief under CERCLA when faced with similar circumstances where the plaintiff undertook remedial action to improve the marketability of the property rather than to reduce or eliminate threats to the environment or public health. *See, e.g. Foster v. U.S.*, 922 F.Supp. 642, 652–53 (D.D.C.1996) (concluding plaintiff landowner failed to establish that investigatory costs for environmental consultants was necessary because decision to hire consultants "was not taken in response to a perceived threat to health or the environment, but in order to further identify barriers to the development of the Site."); *Yellow Freight*, 909 F.Supp. at 1299 (explaining that response costs expended "to place the Site in a condition that was useful to" the plaintiff landowner were not necessary under CERCLA); *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 854 F.Supp. 539, 562 (S.D.Ill.1994) ("In this case the evidence established that plaintiffs had other business reasons for undertaking site investigations and abatement actions. To the extent that these actions were taken for purposes other than responding to an actual and real public health threat, there is no CERCLA liability.")

7. Before evaluating Southfund's response actions under the NCP, the Court must first determine the applicable requirements, which depends on whether Southfund's response action is construed as "removal" or "remedial." "The distinction is important because the requirements for NCP compliance are different, depending on how the response action is characterized." *Morrison Enterprises v. McShares, Inc.*, 13 F.Supp.2d 1095, 1112 (D.Kan.1998). Removal actions are taken when an immediate threat demands rapid action and include, for example, temporary evacuations and the erection of security fencing. *Gates Rubber*, 22 F.Supp.2d at 1188. Remedial actions are, in contrast, substantive, complex measures that provide a permanent cure, such as excavations, dredging, and on-site treatments. *Id.* The parties both assume without discussion that Southfund's actions are remedial in nature. The Court agrees. Southfund did not respond to an emergency threat with an immediate, temporary solution. Instead, Southfund addressed the effects of a non-urgent contamination by cleansing the contaminated soil and purging the ground of contaminated water in a process that lasted more than one year.

ment ("PA") and a remedial site inspection ("SI"), as required by 40 C.F.R. § 300.430; and (4) remedial design ("RD")/remedial action ("RA"), operation, and maintenance of selected remedy, as required by 40 C.F.R. § 300.435. In addition, the statute provides a whole separate section of regulations under the "public comment" aegis. Section 300.700(c)(6) outlines a panoply of public comment requirements for each stage of the remedial process, according to 40 C.F.R. §§ 300.415, 300.430, and 300.435. Finally, ... for a private party to obtain contribution for a response action, it must also demonstrate that the action resulted in a "CERCLA-quality cleanup." Several of the "CERCLA-quality" standards are similar to those already mandated by the NCP provisions, although they speak more to the end-product than the process used to arrive there.... To reach such a standard, the remedial action must:

(1) be "protective of human health and the environment," utilize "permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable," and be "cost-effective";

(2) attain applicable and relevant and appropriate requirements (ARARs); and

(3) provide for meaningful public participation.

National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. 8666, 8793 (1990) (quoting 40 C.F.R. § 300.430(f)(1)(ii)(A), (D), and (E)) (citing also 40 C.F.R. § 300.430 *passim*); *see also County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1516 (10th Cir.1991) (citing same).

22 F.Supp.2d at 1189.

Sears ignores the vast majority of these requirements, arguing only that: (1) the response action was not cost-effective, and (2) Southfund failed to provide a period of public comment. Southfund does not ar-

gue its response action was cost-effective; instead, it cites to Holton's affidavit in its response brief and claims generally the entire response action was of CERCLA quality. As to the lack of public comment, Southfund readily admits it did not give the public at large any opportunity to comment on the response action, but insists the public participation requirement was nonetheless satisfied because DNR was extensively involved in the response action.

*a. Cost–Effectiveness.* To be consistent with the NCP, all remedial actions undertaken must be cost-effective. 40 C.F.R. § 300.430(f)(1)(ii)(D). To determine whether Southfund's remedial action was cost-effective, one must first determine the response action's overall effectiveness by considering the following three criteria: (1) long-term effectiveness and permanence; (2) reduction of toxicity, mobility, or volume through treatment; and (3) short-term effectiveness. § 300.430(f)(1)(ii)(D). The overall effectiveness is then compared to the costs, and the response action is deemed cost-effective "if its costs are proportional to its overall effectiveness." § 300.430(f)(1)(ii)(D).

Without any discussion of these factors or citation to any authority, Sears argues that the response action undertaken by Southfund was not cost-effective. Southfund's response is equally unavailing. Neither party mentions the factors listed above or attempts to explain their position regarding cost-effectiveness in any manner. Left with only conclusory statements by both parties that the project was or was not cost-effective, the Court cannot attempt in good faith to issue a ruling on the matter.

*b. Public Participation.* Pursuant to § 300.700(c)(6) of the NCP, "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action ...." The EPA imposes this requirement on landowners who vol-

untarily undertake a cleanup " 'to ensure that these cleanups-which are performed without government supervision-are carried out in an environmentally sound manner.' " *Bedford Affiliates v. Sills,* 156 F.3d 416, 428 (2nd Cir.1998) (*quoting* 55 Fed.Reg. at 8795 (emphasis added)). Courts are divided as to whether state government participation alone may satisfy the CERCLA public participation requirement. Under the more liberal rule Southfund would have this Court adopt, courts have held that "governmental agencies charged with protection of the public interest may serve as substitutes for participation by individual members of the public, at least where the agency is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance." *American Color & Chemical Corp. v. Tenneco Polymers,* 918 F.Supp. 945, 957 (D.S.C. 1995). *See also Bedford Affiliates,* 156 F.3d at 428 (concluding public participation requirement is satisfied if "a state environmental agency is substantially involved in the formulation and execution of a preliminary remediation plan."). The Court need not express its opinion on this matter, however, because no reasonable juror could find DNR participated extensively in Southfund's project. Southfund thus cannot prove satisfaction of the public participation requirement even under the more liberal approach.

The only evidence Southfund has submitted that describes the extent of DNR's participation in the response action is the following statement from its expert, Gregory Holton, who participated in the response action:

> Prior to initiation of treatment, an Underground Injection Control (UIC) Operating Permit Application was submitted to [DNR] on July 6, 1995. On August 29, 1995 following their review of the application, the Georgia DNR issued a draft UIC Permit 048, and followed the draft shortly thereafter on September 1, 1995 with a final UIC

permit. Associated with the submittal of the application were engineering specifications for the proposed system as well as site related data and information related to the ground water conditions. Given the speedy approval, it is apparent that sufficient information concerning the ground water conditions had been gathered at the site. Further, the remediation measures selected also met with their approval, since no modifications to the engineering plans were necessary. As stated earlier, the site soil and ground water were then aggressively remediated.

(Holton Aff. at 5.) Aside from issuing Southfund a permit to proceed with the response action after reviewing the application, DNR did not participate in the response action whatsoever; there is no evidence to suggest DNR even visited the site during or after the response action. No reasonable juror could review this evidence and conclude DNR was "actively involved in all aspects of the investigation, planning, and remediation . . . ." *American Color & Chemical v. Tenneco Polymers,* 918 F.Supp. 945, 957 (D.S.C.1995).

This conclusion is supported by the very cases Southfund cites; DNR's participation in Southfund's remedial efforts pales in comparison to the level of state environmental agency participation that those courts found sufficient to satisfy the public participation requirement. *See Bedford Affiliates,* 156 F.3d at 428 (concluding public participation requirement satisfied by state agency's approval of two site work plans and supervision of site assessment and interim remedial measures implementation by on-site investigations); *American Color & Chemical v. Tenneco Polymers,* 918 F.Supp. 945, 951, 956–57 (D.S.C.1995) (finding sufficient level of public participation where two state environmental agencies were heavily involved in creation of plan of study and remedial action plan and more than forty staff persons participated in on-site investigations and remediation project); *General Elec.*

Co. v. Litton Business Sys., Inc., 715 F.Supp. 949, 953–54 (W.D.Mo.1989), aff'd, 920 F.2d 1415 (8th Cir.1990) (finding public notice and participation requirement satisfied by state agency's establishment of clean-up levels, approval of waste disposal method, and deployment of five agency personnel to site to perform on-site investigations in process of approving response action and end result).

■ c. Remedial Site Evaluation. Although neither Sears nor Southfund addresses the issue, the record suggests Southfund also failed to perform a remedial site evaluation pursuant to 40 C.F.R. § 300.430, which "defeats a claim of compliance with the NCP." Channel Master Satellite Sys., Inc. v. JFD Elects. Corp., 748 F.Supp. 373, 387 (E.D.N.C.1990). One district court described these evaluation requirements as follows:

"Section 300.700(c)(5)(viii) directs private parties to compile a remedial investigation/feasibility study ("RI/FS") before conducting a cleanup. The RI/FS process requires an analysis of the initial threat of the contamination to health, welfare, and the environment. Id. § 300.430(d)(1). The investigation must also take into account the fifteen factors ranging from hydrogeological concerns to contaminate mobility in deciding the type of remedial action to be taken. Id. § 300.430(d)(2)(I)-(vii).

The feasibility part of the RI/FS process involves a detailed analysis of possible remedial alternatives. Id. § 300.430(e). The alternatives must undergo a detailed evaluation against a set of criteria. Id. 300.430(e)(9)(iii)(A)-(I). After evaluation, the RI/FS eliminates, with explanation, those alternatives that are not the most 'cost-effective' or that are not 'protective of human health' and the environment."

Union Pacific R.R. Co. v. Reilly Indus., Inc., 981 F.Supp. 1229, 1238 (D.Minn.1997) (quoting Sherwin–Williams Co. v. City of Hamtramck, 840 F.Supp. 470, 477 (E.D.Mich.1993)). The feasibility study alone must include an evaluation of alternative actions based on the following nine criteria: (1) overall protection of human health and environment; (2) compliance with ARARs; (3) long-term effectiveness and permanence; (4) reduction of toxicity, mobility, or volume through treatment; (5) short-term effectiveness; (6) implementability; (7) cost; (8) state acceptance; and (9) community acceptance. 40 C.F.R. § 300.430(e)(9)(iii).

The record in this case does not contain any remedial investigation or feasibility study report, and no discussion of the factors listed above can be found. Instead, the reports produced by Southfund simply describe the extent of contamination and set forth the chosen remedial plan without any discussion of alternatives. Southfund virtually concedes it failed to follow these procedures by proffering the following statement from its expert, Gregory Holton:

Unfortunately, the scientific literature and the legal record are replete with examples of sites which for many years have employed, and, in some cases, are still employing the CERCLA RI/FS process to determine how best to clean up a site. Clean up at these sites has yet to begin. Given the RI/FS record, I think it is safe to say that if the RI/FS approach were taken for the Glen Iris Drive site, this site would still be under study instead of being now cleaned up.

(Holton Aff. at 4–5.) Regardless of whether Holton's view of RI/FS studies as bureaucratic hurdles to prompt action is correct, these studies are prerequisites to recovery under CERCLA. The Court thus finds Southfund failed to satisfy the site evaluation requirements of the NCP.

For all of the aforementioned reasons, Southfund's CERCLA claims are dismissed.

**C. Recovery Under HSRA.**

■ Pursuant to HSRA, "[d]uring or following the undertaking of any corrective action, any person may seek contribution

from any other person who has contributed or is contributing to any release of a hazardous waste, a hazardous constituent, or a hazardous substance." O.C.G.A. § 12–8–96.1(e) (1996). Just as with Southfund's CERCLA claim, Sears argues it is not a "person who has contributed ... to any release" because it did not know the tanks existed and did not commit any affirmative acts to cause the leaks. As explained below, however, HSRA, like CERCLA, imposes liability on any defendant who owned property at the time a leak or spill of hazardous substances occurred regardless of whether that defendant's actions or omissions caused the leak or spill or that defendant knew about the leak.

Southfund may seek contribution from any "person who has contributed or who is contributing to a release ...", § 12–8–96(e), which is defined, in relevant part, as "[a]ny person who at the time of disposal of any hazardous waste ... owned or operated any facility as which such hazardous waste ... was disposed of." O.C.G.A. § 12–8–92(9) (1996). Section 12–8–92 provides no definition of disposal; instead, HSRA offers the following definition of release in subsection (11) that clearly encompasses the term disposal: " 'Release' means any intentional or unintentional act or omission resulting in the spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, including without limitation the abandonment or discarding of barrels, containers, and other closed receptacles, or any hazardous waste ...." § 12–8–92(11) (emphasis added). Because leaking and spilling constitute unintentional act of disposing and releasing hazardous materials into the environment, Sears qualifies as a "person who has contributed or who is contributing to a release" because it owned the property at the time hazardous materials leaked or spilled into the environment. As with CERCLA, no requirement of affirmative action to cause the release can be

found within the aforementioned provisions.

HSRA does, however, absolve a person from liability if the person can show that "[a]n act or omission of a third party" caused the release to occur, but this defense does not apply if the third party's act or omission "occurs in connection with a contractual relationship, existing directly or indirectly, with the person ...." O.C.G.A. § 12–8–96.1(c)(3) (1996). Assuming the dry-cleaning company's acts or omissions were the sole cause of the solvent release, it seems, at first blush, that Sears could not be held liable under HSRA because it had no contractual relationship with the dry cleaning company. But, for purposes of § 12–8–96.1(c)(3), "a contractual relationship may be conclusively established by ... land contracts, deeds, or other instruments transferring title or possession, unless the real property on which the disposal ... has occurred ... was acquired by the person after the disposal or release ...." § 12–8–96.1(d)(1). Because, according to Holton, Sears acquired the property before the release of solvents, the deed from the dry-cleaning company to Sears establishes a contractual relationship by which Sears may be held liable for any acts or omissions of the dry-cleaning company that caused the leaks.

But, as explained in Section II.B.1. of this Opinion, causation may not be so attenuated in this case; indeed, reasonable jurors could conclude that Sears knew or should have known the solvent tanks were located on the property and acted unreasonably by ignoring the tanks for twenty-two years while they corroded and released the solvents. Based on a finding Sears knew or should have known about the solvent tanks, reasonable jurors could find Sears acted unreasonably by failing to cap the tanks or remove them before rainwater displaced the solvents and caused the solvent leakage.

**1. Costs Associated with Plume B.**

 Southfund cannot recover response costs incurred to cleanse the soil

and groundwater of the chemical elements of petroleum found in Plume B for two reasons. First, Southfund has produced no evidence to prove that a petroleum release occurred during Sears's ownership of the property. Second, even if such evidence existed, both parties agree that petroleum is not a hazardous material under HSRA for which recovery of response costs may be had. Southfund may, as a result, continue to seek recovery under HSRA, but only for response costs associated with the dry cleaning solvents found in Plume A.

## III. Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment [13–1] is **GRANTED IN PART AND DENIED IN PART** and Defendant's Motion to Withdraw or Amend Admissions [20–1] is **GRANTED.** The Court dismisses Plaintiff's CERCLA claims. Plaintiff's state law claim for contribution under HSRA remains for adjudication, but Plaintiff may only recover response costs incurred to remedy the dry cleaning solvent contamination found in Plume A. **SO ORDERED,** this 30th day of July, 1999.